Spencer,

Raymond called me to tell me that Puja would be driving the children from the park to Dr. Bodan's office. This is not her call. Under my watch, I will not allow my daughter to drive on 836 until I feel comfortable that she is capable on a highway. I cannot prevent the mother from exposing her to danger, as she has in the past, but under my watch, I will take them or Raymond will make other arrangements.

If Raymond demands I let Puja take them against my discretion and fatherly judgment, then she will demand so in email and writing. This way if something happens to them in front of my eyes, I won't feel guilty because of an egotistical GAL.

*Dave Rudra*

CEO

## CLEAN IMAGE CORPORATION

Integrated Facility Solutions

1550 Madruga Avenue, Suite #403 * Coral Gables, Florida 33146

Office: 305-662-5557 * Fax: 305-662-5568 * Dave@cicexperience.com

- Please see our website at: www.cicexperience.com

- We have been serving South Florida's most prestigious facilities in South Florida for over 18 years

- Our clients who get rated by Press Ganey and Gallup polls have been surveyed consistently over the 95% percentile threshold in cleanliness each quarter.

- Our business services include, but not limited to, janitorial, custodial, maintenance and staffing.

"We Mean GREEN".

2

Billing Team
1 John Hancock Way Suite 1350
Boston MA 02217-1959

*John Hancock*
LIFE INSURANCE

August 17, 2011

REM - ST46ILL-000008
Mandira Rudra
10321 SW 140th St.
Miami, FL 33176

RE: MCVL 046638946

Dear Mandira Rudra:

The payment information regarding the Pre-Authorized Payment Plan on your policy has changed. If you did not initiate a change request, you may be receiving this notice as a result of a premium change on your policy anniversary date. Please reference your policy contract for more information.

| | |
|---|---|
| Depositor Name: | Mandira Rudra |
| Bank Name: | BRANCH BANKING AND TRUST C |
| Transit Number: | 263191387 |
| Account Number: | 0000240032678 |
| Total Draft Amount: | $100.00 |
| Draft Date: | 27th of each month |

Please note that if your policy is not paid to the current premium mode, additional premiums may be drafted from your account. These drafts may not coincide with your selected draft date.

If you have any questions or wish to change any of the information stated above please contact us at 1-800-732-5543. Our representatives are available Monday to Friday 8:00 A.M. to 7:00 P.M. Eastern Time.

Sincerely,

Billing Team
John Hancock

Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; John Hancock Life Insurance Company of New York, Valhalla, NY 10595 and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

REM 1/10                                                                                                                                11229-0011

*John Hancock.*
the future is yours

Service Office:
Life New Business
197 Clarendon Street
Boston MA 02116-5010

**Temporary Life Insurance Receipt and Agreement**
☑ John Hancock Life Insurance Company (U.S.A.)
☐ John Hancock Variable Life Insurance Company
☐ John Hancock Life Insurance Company
(hereinafter referred to as The Company)

Print and use black ink.

## RECEIPT

The Company acknowledges receipt of $ 180   paid in connection with the Application for Life Insurance dated 8/4/08

on PROPOSED LIFE INSURED (LIFE ONE)
1. Name Mandira Rudra

PROPOSED LIFE INSURED (LIFE TWO)
2. Name Debjit Rudra

3. Name of Owner Debjit Rudra

8/4/08   X _____ Signature of Agent/Registered Representative

## TEMPORARY LIFE INSURANCE AGREEMENT

This Temporary Life Insurance Agreement is hereby entered into as follows:
ALL PREMIUM CHECKS MUST BE MADE PAYABLE TO THE COMPANY AND SENT TO THE SERVICE OFFICE ADDRESS.
DO NOT MAKE CHECKS PAYABLE TO THE AGENT OR LEAVE THE PAYEE BLANK.

The Company will pay a death benefit to the beneficiary named in the application if the Proposed Life Insured, or the Surviving Proposed Life Insured under a survivorship plan, dies while this Agreement is in effect, subject to the terms and conditions set out below.

1. **WHEN AGREEMENT APPLIES.** No coverage will be provided under this Agreement if any of the following apply:
    (a) any of the questions in the Temporary Life Insurance Agreement Application are answered "Yes" or left blank; or,
    (b) any Proposed Life Insured is under age 20 or over age 70 (nearest birthday) as of the date that this Temporary Life Insurance Receipt and Agreement is signed by the Agent/Registered Representative ("the Effective Date"); and,
    (c) the amount applied for under the above referenced Application for Life Insurance is more than $10,000,000 of individual coverage or $15,000,000 of survivorship coverage.
2. **LIMITED AMOUNT OF INSURANCE.** The amount of Temporary Life Insurance coverage provided by The Company will be the lesser of:
    (a) the amount of insurance applied for including supplementary benefits and accidental death benefit; or,
    (b) $1,000,000 for individual coverage or $5,000,000 for survivorship coverage.
   This maximum amount of coverage applies to the total amount under this Agreement and any other Temporary Life Insurance Agreement with The Company covering the Proposed Life Insured. If there are two or more persons proposed for insurance, this maximum amount applies to the total coverage.
3. **ACCIDENTAL DEATH BENEFIT LIMITATION.** If the benefits applied for include an accidental death benefit, no such benefit will be paid in respect of a death caused by:
    (a) voluntarily taking or absorbing of any drug, medicine, sedative or poison (except in connection with any Proposed Life Insured's employment) unless prescribed by a licensed doctor other than the Proposed Life Insured; or,
    (b) travel in any aircraft other than as a passenger.
4. **DATE INSURANCE BEGINS.** Insurance under this Agreement will begin on the Effective Date if The Company's application for life insurance has been completed and a payment has been received by The Company for at least one-twelfth of the annual premium for the base plan and any supplementary benefits requested in the application. If payment is made by check or draft, no insurance will be provided by this Agreement unless the check or draft is honored when first presented for payment.
5. **TERMINATION AND REFUND OF PREMIUM.** Insurance under this Temporary Life Insurance Agreement will end on the earliest of:
    (a) the 90th day after the date of this Agreement;
    (b) the day before the date insurance takes effect under the policy applied for;
    (c) the date The Company mails notice to the applicant either declining to offer insurance to the applicant or offering insurance on a basis other than as applied for.
   Upon termination of this Temporary Life Insurance Agreement, The Company's only liability will be to refund the premium paid without interest.
6. **SUICIDE.** If any person proposed for insurance, whether sane or insane, commits suicide, The Company's only liability will be to refund the premium paid without interest.
7. **MISREPRESENTATION.** If there is any material misrepresentation in the Temporary Life Insurance Agreement Application, The Company's only liability will be to refund the premium paid without interest.
8. **OTHER CONDITIONS.** No one is authorized to change or waive any provision of this Agreement.

Give this page to the Owner



NB5004US (12/2007)   VERSION (12/2007)

CLEAN IMAGE OF MIAMI INC

Page 4 of 6
Statement Period
07/01/11 through 07/31/11
I0  P PA  0 A 60
Enclosures 0
Account Number   8980 2917 9577

## Withdrawals and Debits - Continued

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 07/05 | 350.00 | Ice Legal Pa____ Des:8666089503 ID: Indn:Clean Image Of Miami I Co ID:MB Epx  Ccd | 902386009190355 |
| 07/07 | 135.43 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902387008464141 |
| 07/07 | 161.37 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902387008464139 |
| 07/07 | 168.54 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902387008464140 |
| 07/07 | 72.00 | Cice Clean Image Des:Agency  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902387008464137 |
| 07/12 | 336.61 | Ppl Direct Debit Des:Elec Pymt ID:3958819405 Telv Indn:Debjit Rudra  Co ID:3590247775 Tel | 902393003416540 |
| 07/13 | 2,351.08 | IRS  Des:Usataxpymt ID:274159400173471 Indn:Clean Image Of Miami I Co ID:3387702000 Ccd | 902393093251349 |
| 07/15 | 50.00 | John Hancock Lif Des:Varannuity ID:  2704907 Indn:Rudra Debjit  Co ID:9305319295 Ppd | 902395011455735 |
| 07/15 | 50.00 | John Hancock Lif Des:Varannuity ID:  2704922 Indn:Rudra Debjit  Co ID:9305319295 Ppd | 902395011455726 |
| 07/19 | 600.00 | Jhusa  Des:Payments  ID:011046403593 Indn:Clean Image Of Miami I Co ID:6779361019 Ppd | 902399008159138 |
| 07/21 | 454.64 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902302007793855 |
| 07/21 | 159.52 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902302007793853 |
| 07/21 | 100.42 | Cice Clean Image Des:Transfer  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902302007793854 |
| 07/21 | 72.00 | Cice Clean Image Des:Agency  ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902302007793849 |
| 07/27 | 2,313.74 | IRS  Des:Usataxpymt ID:274160800736977 Indn:Clean Image Of Miami I Co ID:3387702000 Ccd | 902307009664980 |
| 07/29 | 1,500.00 | FL Tlr cash withdrawal from Chk 9577 Banking Ctr South Miami  #0001538 FL. Confirmation# 0696271754 | 957507299954059 |

Card Account # 4635 7600 1911 7187:

| Date | Amount | Description | Bank Reference |
|---|---|---|---|
| 7/05 | 30.70 | CheckCard  0701 House Of India | 929907012195220 |
| 7/06 | 175.42 | CheckCard  0702 Millers Miami 01000538 | 929907020618802 |
| 7/06 | 1.50 | CheckCard  0706 Miami Parking Authority | 929907062315133 |
| 7/07 | 31.01 | CheckCard  0706 House Of India | 929907063119730 |
| 7/08 | 47.80 | Exxonmobil POS  07/08 #000260993 Purchase | 946307080260993 |
| 7/08 | 39.07 | CheckCard  0707 Paradise Bar And Grill | 929907073330569 |
| 7/11 | 80.95 | CheckCard  0707 Pf Changs #2200 | 929907070531322 |
| 7/11 | 5.34 | CheckCard  0708 Blockbusterexpress | 929907081727904 |
| 7/13 | 6.42 | CheckCard  0711 Blockbusterexpress | 929907111640095 |
| 7/13 | 3.21 | CheckCard  0711 Blockbusterexpress | 929907111640029 |
| 7/14 | 87.86 | CheckCard  0712 Red Lobster US00007971 | 929907120978970 |
| 7/14 | 66.19 | Publix Super M  07/14 #000500829 Purchase | 946307140500829 |
| 7/14 | 26.35 | CheckCard  0712 Millers Miami 01000538 | 929907120004086 |
| 7/14 | 23.98 | Cvs 05243 0524  07/14 #000738497 Purchase | 946307140738497 |
| 7/14 | 22.98 | CheckCard  0712 Smoke T Bbq | 929907121614865 |
| 7/14 | 13.83 | Exxonmobil POS  07/14 #000101046 Purchase | 946307140101046 |
| 7/15 | 51.79 | CheckCard  0714 Johnny Rockets #122 | 929907143602693 |
| 7/15 | 12.85 | CheckCard  0714 Paradise Bar And Grill | 929907143402347 |
| 7/15 | 3.00 | CheckCard  0715 Miami Parking Authority | 929907153946025 |






CLEAN IMAGE OF MIAMI INC

Page 3 of 5
Statement Period
06/01/11 through 06/30/11
E0  P PA  0 A 60
Enclosures 0
Account Number  8980 2917 9577

## Withdrawals and Debits - Continued

Gap in sequential check numbers.

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 6/02 | 250.00 | Ice Legal Pa___ Des:8666089502 ID: Indn:Clean Image Of Miami I Co ID:MB Epx Ccd | 902352004468078 |
| 6/07 | 459.11 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902358007323543 |
| 6/07 | 295.32 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902358007323542 |
| 6/07 | 160.47 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902358007323541 |
| 6/07 | 72.00 | Cice Clean Image Des:Agency ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902358007323539 |
| 6/10 | 2,703.23 | IRS Des:Usataxpymt ID:274156100025486 Indn:Clean Image Of Miami I Co ID:3387702000 Ccd | 902360006222789 |
| 6/10 | 450.68 | Cice Clean Image Des:Transfer ID: Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902361008004707 |
| 6/20 | 300.00 | Jhusa Des:Payments ID:011045403558 Indn:Clean Image Of Miami I Co ID:8778351019 Ppd | 902368007599471 |
| 6/21 | 459.71 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902372004143817 |
| 6/21 | 221.76 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902372004143816 |
| 6/21 | 160.47 | Cice Clean Image Des:Transfer ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902372004143815 |
| 6/21 | 72.00 | Cice Clean Image Des:Agency ID:Cice Indn:Clean Image Of Miami I Co ID:1650516371 Ccd | 902372004143813 |
| 6/24 | 2,444.58 | IRS Des:Usataxpymt ID:274157500621706 Indn:Clean Image Of Miami I Co ID:3387702000 Ccd | 902374002790023 |
| 6/27 | 35.00 | Overdraft Item Fee For Activity Of 06-24 Electronic Transaction | 953906240004558 |
| 6/27 | 35.00 | Overdraft Item Fee For Activity Of 06-24 Electronic Transaction | 953906240004559 |
| 6/27 | 35.00 | Overdraft Item Fee For Activity Of 06-24 Electronic Transaction | 953906240004560 |
| 6/27 | 35.00 | Overdraft Item Fee For Activity Of 06-24 Check #0000020336 | 953906240004557 |
| 6/30 | 33.00 | Check Order00075 Des:Fee ID:P026663384 Indn:Clean Image Of Miami I Co ID:0000000075 Ppd | 902381012597167 |

ard Account # 4825 7609 1911 5285:

| Date | Amount | Description | Bank Reference |
|---|---|---|---|
| 6/01 | 20.58 | Whole Foods MA 06/01 #000613828 Purchase | 946306010613828 |
| 6/01 | 19.75 | CheckCard 0520 The Super Shine | 929905300547362 |
| 6/02 | 405.00 | 12425 S. Dixie 06/01 #000248478 Withdrwl | 946306010248478 |
| 6/02 | 24.59 | CheckCard 0531 Kfc #0880002 08800021 | 929905310302873 |
| 6/02 | 3.00 | CheckCard 0602 Miami Parking Authority | 929906022593229 |
| 6/02 | 2.00 | 12425 S. Dixie 06/01 #000248478 Withdrwl | 946306010248478 |
| 6/03 | 700.00 | CheckCard 0602 Berman Rennert Vogel MA | 929906021232327 |
| 6/03 | 99.66 | CheckCard 0601 Millers Miami 01000538 | 929906010001666 |
| 6/03 | 88.00 | CheckCard 0531 Bice Bistro | 929905310883475 |
| 6/06 | 3,000.00 | CheckCard 0603 Jonathan Meltz PA | 929906032443350 |
| 6/06 | 198.84 | Cvs 05243 0524 06/05 #000517929 Purchase | 946306050517929 |
| 6/06 | 48.82 | Exxonmobil POS 06/06 #000109807 Purchase | 946306060109807 |
| 6/06 | 30.45 | CheckCard 0603 Kyojin | 929906031276383 |
| 6/06 | 20.54 | Office Max 135 06/05 #000559489 Purchase | 946306050559489 |

E

2011-11-02 07:39   BB&T Lumberton NC         9102722723 >>              P 2/3

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DEBJIT RUDRA,                        FMCE

    Petitioner/Husband,          CASE NO. 10-010920 FC 28

and

MANDIRA RUDRA,

    Respondent/Wife.

SUBPOENA FOR PRODUCTION OF DOCUMENTS FROM NONPARTY

THE STATE OF FLORIDA
TO: Branch Bank & Trust Co.
10899 SW 72nd Street
Miami, Florida 33173

    YOU MUST go to Mitchell & West, LLC, 3191 Coral Way, Suite 504, Miami, Florida 33145, on November 9, 2011, at 2:15 p.m. and bring with you at that time and place the following: All banking records associated with MandiraRudra, Social Security Number ███-██-7815, wherein she is the primary account holder, joint account holder, or authorized signatory on the account from the years 2005-present.

    These items will be inspected and may be copied at that time. You will not have to leave the original items. Account # ████████5675

    You may obey this subpoena by providing readable copies of the items to be produced to the party or his/her attorney whose name appears on this subpoena on or before the scheduled date of production. You may condition the preparation of the copies upon payment in advance of the reasonable cost of preparation. If you mail or deliver the copies to the attorney whose name appears on this subpoena before the date indicated above, you do not have to appear in person.

    You may be in contempt of court if you fail to: (1) appear as specified; (2) furnish the records instead of appearing as provided above; or (3) object to this subpoena.

    You can only be excused by the person whose name appears on this subpoena and, unless excused by that person or the Court, you shall respond as directed.

Dated: 10/13/2011

Florida Supreme Court Approved Family Law Form 12.931(b), Subpoena for Production from a Nonparty (03/04)

**EXHIBIT A**

2011-11-02 07:40 BB&T Lumberton NC 9102722723 >> P 3/3

CLERK OF THE CIRCUIT COURT

(SEAL)

By:_____
Deputy Clerk

This part to be filled out by the court or filled in with information you have obtained from the court:
If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact (name)_____
(address)_____(telephone) within 2 working days of your receipt of this subpoena. If you are hearing or voice impaired, call TDD 1-800-955-8771.

I CERTIFY that I gave notice to every other party to this action of my intent to serve a subpoena upon a person who is not a party to this action directing that person to produce documents or things without deposition. I also certify that no objection under Florida Rule of Civil Procedure 1.351 has been received by the undersigned within 10 days of service of this notice, if service was by hand delivery or appropriate facsimile transmission, and within 15 days if service was by mail.

Dated:_____

_____
Signature of Party

MITCHELL & WEST, LLC
Attorneys for Petitioner/Husband
Terra Bank Building
1101 Coral Way, Suite 504
Miami, FL 33145
Phone (305) 447-1333
Fax (305) 441-0333

Florida Supreme Court Approved Family Law Form 12.931(b), Subpoena for Production from a Nonparty (02/06)

CASE NO. 10-1451 FC 19

able to exercise this timesharing unless the school calendars coincide.

J. <u>Travel outside of jurisdiction with the minor child</u>: Either party may travel outside of the jurisdiction with the minor child upon reasonable notice to the other party. Neither party may travel outside of the country with the minor child without the written consent of the other party, which consent shall not be unreasonably withheld, or a Court order. A full itinerary shall be provided including all contact, flight and lodging information.

K. <u>Child's school</u>: The child shall continue to attend St. Louis Catholic School through the conclusion of the 2010-2011 school year. Thereafter, the parties agree that the child is to be enrolled at Kenwood Elementary. However, the Husband agrees that the child may continue to attend St. Louis Catholic School should the Wife desire for the child to continue to be enrolled there. The child's attendance at St. Louis shall be at the Wife's sole expense.

L. <u>Misc.</u>: Neither party shall post the child's whereabouts on-line, i.e., facebook, twitter, or any other social networking site. The child shall not have a facebook or other social networking page until she is at least 10 years of age.

The child shall not be in the presence of the Rudra family during the Husband's timesharing with the minor child for a period of three (3) months from the date of execution of this Agreement. However, this provision shall be null and void in the event that Dave Rudra is incarcerated for a period of 90 days, committed to a psychiatric facility for a period of 90 days, permanently move from Miami-Dade, Broward or Palm Beach County, Florida or dies.

GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE
AND OCCURANCES

STATE OF FLORIDA

COUNTY OF MIAMI-DADE



EXHIBIT B

PERSONALLY appeared before me, the undersigned authority in and said county and state, Jacquetta Lortz who having been being first duty sworn by the undersigned Notary Public, deposes and says:

Affiant is witness and is informed in the area of such information presented hereby presents a sound analysis and in good faith, states the following:

On August 25th, 2011 I went in to the CGPD to be interviewed by Detective Wentzel about the Payroll Fraud conducted by Shirley Martinez. The Detective showed me a picture of Jorge Fernandez and asked if I had seen him. I told him that I had as he had come in to fill out an application for Business Relations and interviewed with Dave. Det. Wentzel also showed me a picture of Glebys Grinan and asked if I saw her. I told him no. The detective then informed me that according to Jorge, Glebys and Ms. Maritinez that they did work for Clean Image and that Dave Rudra hired them personally. I replied that Dave did not hire him because during the interview he felt suspicious about Jorge Fernandez and he walked away saying "I cannot work for someone who cannot trust his employees".

The detective said, how do you know that they did not work for Clean Image if Dave hired them? I told him that all employees have to report to me as I was the operations manager and I handle all payroll time-sheets. None of the people who cashed the checks or the people in the pictures worked for Clean Image or had an application or signed in to payroll time-sheets.

The detective asked who does payroll. I told him that I turn in the payroll sheets to Shirley and she enters them on-line in the computer. The only day Shirley came in to work early would be on the days she entered payroll, and could have entered transactions before I got there. In November, Dave told me to train on payroll with Shirley so I watched her enter and transmit payroll. I never entered it myself or had a sign on ID until she left. The detective said according to Shirley, Dave would log in after Shirley and make the changes and transmit payroll. I told him that Dave never did payroll and does not know how to do payroll. The detective looked surprised and asked me, how can the president of the company not know how to do payroll? I told him that's why he hires someone to do the payroll. I also told him that I am the only one to do the payroll now and Dave does not do it. Besides, Dave was hardly in the office when Shirley used to do payroll. The detective said what happens when you are sick. I told him that I haven't been sick so far and it can be done from your home if that is the case and I told him that you can see the IP Log where Shirley did enter into payroll several times from her house IP, because it was not the office IP. The detective gave a face like he did not want to believe me. I asked him, why would Dave write a check to an employee who did not work there and not benefit from it? The detective did not answer.

*If additional space is needed refer to attachment as Part II of Affidavit.

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

The detective then changed the subject and told me that, did you know Dave has over 65 people on payroll with bad Social Security Numbers and some of them are deceased? I told him that I discovered that earlier when people called in saying that their tax returns had the wrong social security numbers on them. I informed Dave and we contacted the payroll company and found out that the numbers were totally off. Dave asked me to correct them immediately. I later pulled all the current employees and found that even Dave's Social Security Number was changed and he did not know about it. I went into prior payroll registers and found that they did have the correct social security numbers, but at some point many numbers were changed.

The detective looked at me and said, that he will be investigating the social security numbers as it was a federal offence and that if Dave did change the numbers, that he would be federally prosecuted. I asked him, why would Dave change the Social Security Numbers when he has legally eligible employees? He said he does not know why Dave would do that, and gave me the impression that he wanted to believe Shirley. It seemed in his tone and body language as if the detective was more interested in trying to find fault in Dave than the real reason why we reported the crime of Ghost Employees.

I need to add that after being interviewed by the detective, I recalled several conversations with Shirley. One of the conversations was that she complained that she wanted to quit because Dave suspected her of passing information to his wife about what he was doing. On another occasion right at the time she quit, she told me that I need to be careful because Dave is going to have my mother arrested for stealing his jewelry. She also said that I need to quit and not get involved.

I clearly remember another conversation which did not make sense at the time. On January 25, 2011, Shirley told me that she gives this company three months before the feds come and close it down. I did not know why she was saying that, but she also added that I should come and work for her because she was an officer, and after the divorce either she would get the company or his wife Mandira would own the company when Dave goes to jail. She said "and trust me, you don't want to work for his wife because she is a bitch". I did not know what she was talking about then, although I did get scared I stayed with Clean Image because I did not see Dave do anything unusual. At the time I did not know that Shirley opened her own company and that she had stolen all that money. Later we found emails between Shirley, Dave's wife, Det. Ramesh NyBerg and Detective Carlos Baixali. We also noted all payroll records prior to November 2010 are missing. In November I started maintaining all payroll records and timesheets. Her personnel files and Daniel Castillo are also missing.

The day I learned that Shirley was caught for bank fraud, she called me and told me that she was going to file a restraining order on Dave. The following Monday 8 police officers came to file a restraining order on Dave. Shirley was in contact with Angela Commissiong prior to the court date and asked Dave for $5000.00 so she would drop the restraining order and not file charges. Angela pleaded to Dave to give it to her but Dave refused. She also told Angela that the cops wanted to catch Dave violating the restraining order and arrest him, but she refused to entrap him.

Affiant Name: Jacquelina Lopez

Affiant Signature: _____ Date: 9/9/11

SWORN to and subscribed before me, on this 9th day of September, 2011.

NOTARY PUBLIC

My Commission Expires: April 26, 2014

*If additional space is needed refer to attachment as Part II of Affidavit.



STEFANIE MADSEN
Commission # DD 984791
Expires April 26, 2014
Bonded Thru Troy Fain Insurance 800-385-7019



# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

PERSONALLY appeared before me, the undersigned authority in and said county and state, Jacquetina Lahoz who having been being first duty sworn by the undersigned Notary Public, deposes and says:

Affiant is informed in the area of such information presented hereby presents a sound analysis and in good faith, states the following:

I started working at Clean Image in October and was trained to manage the employees by Dave and to do payroll by Shirley Martinez. I spent a lot of time with Shirley and she was very nice to me. During that time we had a client at Lincoln LPC called Nestor Ramirez who kept calling for me to come to his building for things that were not our responsibility. One day in November he emailed me to communicate with him directly and not to get Dave involved. I told Dave this and he told me to write Nestor a reply that I had to notify him of everything going on in the company. Nestor then stopped calling me.

Later, Shirley would communicate directly with Nestor and take me to his buildings. We kept getting complaints only from Sheila in the Inter-America Suite. I could not understand why because as the operations person, I checked on that suite every day and everything was left perfect. One day after a complaint I visited the suite and the receptionist told me that Sheila had come earlier to ruffle a plant and then made a complaint to Nestor. The same thing also happened in S&K properties where Shirley would deal with Carla. For the next few weeks, Shirley would often ask me to go to lunch with Nestor and her. She also asked me if Nestor had a chance to speak to me yet. I asked her about what and she said never mind.

From then on, mostly Nestor dealt with Shirley. In January, we received a termination letter from both S&K and LPC for 5 properties without cause to be effective March 1, 2011. Dave tried to negotiate with both clients and told me that they would reconsider. On the last week of the termination date, Dave asked me to go check all the properties. As I was going to check the properties, Shirley told me not to bother, because she knew they were not going to renew the contracts. I still checked them as Dave asked and the following Monday there was another company in place as Shirley said.

By this time Dave had caught that Shirley was having the payroll delivered to her house and made lots of unauthorized Bank Charges. By the time I came to work I found out that Shirley was not coming back. Dave stopped the payroll from going to her house and delivered to the office. Dave also found a series of emails between Shirley and Nestor from November forward about meeting and talking after 6.pm.

*If additional space is needed refer to attachment as Part II of Affidavit.

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

When we received payroll and sorted the checks, I found on the ledger that a check was issued to Daniel Castillo, Shirley's husband. Daniel Castillo's check was not enclosed in the package and I brought this to Dave's attention. Daniel Castillo was not working for us.

Dave then had me go through more of the payroll ledger from November on and found more people who did not work for us but were issued checks. I found Maritza Castillo, Michelle Fernandez, and Jorge Hernandez all receiving checks, but did not work for us. Since November, I never saw the checks to these people ever come to the office. I found almost $23,000.00 of checks issued to people who did not work for us. Since November, I was at the office and only Shirley Martinez was issued a log-on for Pay-Day payroll and even though I watched her do payroll, Shirley always entered payroll. However, I did notice that she came in earlier than me on the days she entered payroll.

Dave asked me to check the Bank statements to see who cashed out the checks. As I went check by check, I noticed that most of the checks issued to the employees, were changed and cashed by a Jorge Fernandez. Even the one issued to Jorge Hernandez, was signed by Jorge Fernandez and deposited in the same bank account. Coincidentally I recall meeting a Jorge Luis Fernandez, who opened up my bank account at Wachovia.

Later we discovered that on January 13, 2011, Jorge Fernandez and Daniel Castillo opened up a cleaning company called Global Outsource Solutions with the address on the website being the same as Shirley Maritnez. We called the number and Shirley picked up the phone.

Before she quit she spoke to me several times and tried to tell me that Dave was going to have my mother arrested and tried to convince me that Dave was dangerous and that he tried to kiss her and she was scaring me about Dave. Although I did not see anything of that nature happen, Shirley cried and was very convincing that Dave would have my mother arrested for stealing his necklace. My mother cleans Dave's house. She also tried to convince me that Dave had a mental problem and needed mental help.

SWORN to and subscribed before me, on this 7th day of June, 20 11.

STEFANIE MADSEN
Commission # DD 984791
Expires April 28, 2014
Bonded Thru Troy Fain Insurance 800-385-7019

NOTARY PUBLIC

My Commission Expires:

*If additional space is needed refer to attachment as Part II of Affidavit.



Your Honor,
Please see this message from Mr. Rudra, which has attached the subpoena he had served at my work. I am also sending all the materials with a courier so that you will get it early Monday morning.
Thank you.

Mandira Rudra

---------- Forwarded message ----------
From: Mandira Rudra <mandira.rudra@gmail.com>
Date: Wed, Feb 29, 2012 at 4:41 PM
Subject: Fwd: Visitation.... Subpoena for Trial. Federal Case on Monday
To: "ramesh.nyberg@gmail.com" <ramesh.nyberg@gmail.com>


---------- Forwarded message ----------
From: "Dave Rudra" <Dave@genesismanagement.us>
Date: Feb 29, 2012 4:30 PM
Subject: Visitation.... Subpoena for Trial. Federal Case on Monday
To: "Mandira Rudra" <mandira.rudra@gmail.com>, <mryrymnd@aol.com>, "Stuart Abramson" <lawstu08@gmail.com>
Cc: "Spencer" <swest@mitchellandwest.com>, <Preferredprocess@hotmail.com>


Mandira,


Due to an upcoming Federal Case, I will be preoccupied tonight. You may plan accordingly with the children. In the future, I will establish that you may drop off the children either at my work or home during visitation. I will drop the children back to your house. This way the burden on me is relieved as you have refused to let any of my friends and help pick them up when I am

## Dave Rudra

| | |
|---|---|
| From: | Ramesh Nyberg <ramesh.nyberg@gmail.com> |
| Sent: | Saturday, March 10, 2012 2:41 PM |
| To: | Dave@genesismanagement.us |
| Cc: | swest@mitchellandwest.com |
| Subject: | Re: Goodman Emails from NyBerg. In Federal Case |

Mr. Rudra,
You may believe whatever you wish. What is fact is that *you* included me in your lawsuit by putting my name on the exhibit list, and trying to include my divorce in your defense. You drag people into your legal problems, and then you complain about them?
Whomever I communicate with is entirely my business, so if you have a complaint, lodge it somewhere else and don't bother me about it.

On Sat, Mar 10, 2012 at 1:55 PM, <Dave@genesismanagement.us> wrote:
Hello Mr. NyBerg,

I was curious as to why you would be writing emails (attached) for Mandira and sending them to Judge Goodman yourself. Was Judge Goodman supposed to weight the fact that you may have been his courtroom before? I know you used to write Mandira's school projects before, but interfering in a Federal Lawsuit is taking it a bit to far. Mandira is not capable of writing such letters and you sent them from your Email. Please stop interfering in other lawsuits moving forward.

Thanks
Dave

Dave Rudra

| | |
|---|---|
| From: | Ramesh Nyberg <ramesh.nyberg@gmail.com> |
| Sent: | Wednesday, March 14, 2012 8:17 PM |
| To: | Dave@genesismanagement.us |
| Cc: | w.washington221@gmail.com; lawstu08@gmail.com; miracleworker18@aol.com; wglasko@gcprobatelaw.com |
| Subject: | Re: Emails to Burnstein |

I'm sure he'll be intrigued to hear all about it.

On Wed, Mar 14, 2012 at 5:23 PM, <Dave@genesismanagement.us> wrote:
NyBerg,

It was brought to my attention that you are emailing Burnstein updates of what you want him to know.

Dave

1

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

STATE OF FLORIDA

COUNTY OF MIAMI-DADE



PERSONALLY appeared before me, the undersigned authority in and said county and state, Jacquetma Lahoz who having been being first duty sworn by the undersigned Notary Public, deposes and says:

Affiant is witness and is informed in the area of such information presented hereby presents a sound analysis and in good faith, states the following:

On August 25th, 2011 I went in to the CGPD to be interviewed by Detective Wentzel about the Payroll Fraud conducted by Shirley Martinez. The Detective showed me a picture of Jorge Fernandez and asked if I had seen him. I told him that I had as he had come in to fill out an application for Business Relations and interviewed with Dave. Det. Wentzel also showed me a picture of Glebys Grinan and asked if I saw her. I told him no. The detective then informed me that according to Jorge, Glebys and Ms. Maritinez that they did work for Clean Image and that Dave Rudra hired them personally. I replied that Dave did not hire him because during the interview he felt suspicious about Jorge Fernandez and he walked away saying "I cannot work for someone who cannot trust his employees".

The detective said, how do you know that they did not work for Clean Image if Dave hired them? I told him that all employees have to report to me as I was the operations manager and I handle all payroll time-sheets. None of the people who cashed the checks or the people in the pictures worked for Clean Image or had an application or signed in to payroll time-sheets.

The detective asked who does payroll. I told him that I turn in the payroll sheets to Shirley and she enters them on-line in the computer. The only day Shirley came in to work early would be on the days she entered payroll, and could have entered transactions before I got there. In November, Dave told me to train on payroll with Shirley so I watched her enter and transmit payroll. I never entered it myself or had a sign on ID until she left. The detective said according to Shirley, Dave would log in after Shirley and make the changes and transmit payroll. I told him that Dave never did payroll and does not know how to do payroll. The detective looked surprised and asked me, how can the president of the company not know how to do payroll? I told him that's why he hires someone to do the payroll. I also told him that I am the only one to do the payroll now and Dave does not do it. Besides, Dave was hardly in the office when Shirley used to do payroll. The detective said what happens when you are sick. I told him that I haven't been sick so far and it can be done from your home if that is the case and I told him that you can see the IP Log where Shirley did enter into payroll several times from her house IP, because it was not the office IP. The detective gave a face like he did not want to believe me. I asked him, why would Dave write a check to an employee who did not work there and not benefit from it? The detective did not answer.

*If additional space is needed refer to attachment as Part II of Affidavit.

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

The detective then changed the subject and told me that, did you know Dave has over 65 people on payroll with bad Social Security Numbers and some of them are deceased? I told him that I discovered that earlier when people called in saying that their tax returns had the wrong social security numbers on them. I informed Dave and we contacted the payroll company and found out that the numbers were totally off. Dave asked me to correct them immediately. I later pulled all the current employees and found that even Dave's Social Security Number was changed and he did not know about it. I went into prior payroll registers and found that they did have the correct social security numbers, but at some point many numbers were changed.

The detective looked at me and said, that he will be investigating the social security numbers as it was a federal offence and that if Dave did change the numbers, that he would be federally prosecuted. I asked him, why would Dave change the Social Security Numbers when he has legally eligible employees? He said he does not know why Dave would do that, and gave me the impression that he wanted to believe Shirley. It seemed in his tone and body language as if the detective was more interested in trying to find fault in Dave than the real reason why we reported the crime of Ghost Employees.

I need to add that after being interviewed by the detective, I recalled several conversations with Shirley. One of the conversations was that she complained that she wanted to quit because Dave suspected her of passing information to his wife about what he was doing. On another occasion right at the time she quit, she told me that I need to be careful because Dave is going to have my mother arrested for stealing his jewelry. She also said that I need to quit and not get involved.

I clearly remember another conversation which did not make sense at the time. On January 25, 2011, Shirley told me that she gives this company three months before the feds come and close it down. I did not know why she was saying that, but she also added that I should come and work for her because she was an officer, and after the divorce either she would get the company or his wife Mandira would own the company when Dave goes to jail. She said "and trust me, you don't want to work for his wife because she is a bitch". I did not know what she was talking about then, although I did get scared I stayed with Clean Image because I did not see Dave do anything unusual. At the time I did not know that Shirley opened her own company and that she had stolen all that money. Later we found emails between Shirley, Dave's wife, Det. Ramesh NyBerg and Detective Carlos Baixali. We also noted all payroll records prior to November 2010 are missing. In November I started maintaining all payroll records and timesheets. Her personnel files and Daniel Castillo are also missing.

The day I learned that Shirley was caught for bank fraud, she called me and told me that she was going to file a restraining order on Dave. The following Monday 8 police officers came to file a restraining order on Dave. Shirley was in contact with Angela Commissiong prior to the court date and asked Dave for $5000.00 so she would drop the restraining order and not file charges. Angela pleaded to Dave to give it to her but Dave refused. She also told Angela that the cops wanted to catch Dave violating the restraining order and arrest him, but she refused to entrap him.

Affiant Name: Jacquetra Lanz

Affiant Signature: _____   Date: 9/9/11

SWORN to and subscribed before me, on this 9th day of September, 2011.

NOTARY PUBLIC

My Commission Expires: April 26, 2014


STEFANIE MADSEN
Commission # DD 984791
Expires April 26, 2014
Bonded Thru Troy Fain Insurance 800-385-7019

*If additional space is needed refer to attachment as Part II of Affidavit.

## NAME AFFIDÁVIT AND SWORN STATEMENT

STATE OF FLORIDA      )
                      ) SS:
COUNTY OF MIAMI-DADE  )

I, the Declarant Jennifer Vandermolen (a/k/a Kaya Van), DOB 5/8/68, Identification Fl Driver's License No: 1142473, expiration date: 5/8/2015, do hereby certify, swear or affirm, and declare under penalty of perjury that this is my legal name and that the following statements are true to the best of my knowledge and that I can be asked to take a sworn deposition and or be asked to appear in Court to testify of same.

Dave showed me the transcripts of the testimony that were given during the Leonard Screen Case. I was present in the courtroom sitting on the side of defendant, Dave Rudra and Clean Image's representing lawyer Spencer West when Marissa Marino was asked on the stand whose house she was staying in and she answered "Ram". Then she was asked if she meant detective Ramesh Nyberg and she answered "yes". It should be noted that the information contained in the transcripts is incorrect. On page 10 this instance referring to Ramesh Nyberg as Maresh.

During the course of the trial Spencer West, the lawyer for Clean Image was exhibiting behavior and actions that became increasingly questionable. When attempts to locate Marissa were unsuccessful, Mr. West suggested to the courts to have her arrested and brought in by the US Marshals. Upon Judge Goodman's suggestion to subpoena Marissa Marino's mother and or brother in an effort to draw Ms. Marino to court, Mr. West played a role as though he was using his skills as a lawyer to work against the defendant's defense. The night that the subpoena was served for the family member(s) of Marissa Marino, Dave showed me a text from Spencer West stating that Marissa Marino was served and called him to say that Leonard Screen did not work overtime.

The following day in court Mr. West tried to convince Dave and me as to the reasons why we should get ahold of Marissa Marino and not have her to take the stand. He said we would lose the headway that we had made so far with the trial, that if we did call her to testify it would work against us and cause us to lose the trial. He said he spoke to Marissa Marino said she would

show up with a lawyer and she would deny everything and plead the 5th. He further told us that Marissa said that she would say that she made a deal with Dave to pay him $7,000.00 not to prosecute her for allegedly admitting her crimes. Mr. West said his legal position was to not use her to testify in the case and his tone was very serious and direct. Mr West was vehement about not having Marissa Marino take the stand or we would lose the case. Dave was very upset at Mr. West and said, he would take his chances and put her on the stand anyway after he spent all that money trying to locate her.

Personally I could not figure out how within 24 hours he completely changed his tone from being upbeat and supportive about having Marissa Marino testify in conversations he had with Dave the same night he received the text that she would in fact come in voluntarily to take the stand, to trying to say anything in his power that would convince us from having Marissa Marino take the stand. When I saw what Mr. West was trying to do and how he was trying to prevent the truth from surfacing- I became so disgusted with him and I even told Mr. West at that point, "I am so disgusted with you right now."

At another juncture in the trial we would be breaking for lunch and Dave went to the exhibits desk and was searching for a particular trial exhibit that he would use after the break in his cross examination. The document was nowhere to be found. When Dave asked Mr. West where was the described document Mr. West replied, "I've seen many documents during this trial I don't know which document you're talking about Dave." Dave went on to describe the document and Mr. West began to become irritated attesting that he didn't know anything about that document.

During the lunch break Dave explained which document it was and we discussed the exact labeling of the exhibit, that being 7 of exhibit P3. Dave said to me "I bet that document will be there when we get back from lunch," I asked him why and he said, "you'll see it will be there when we return." Sure enough, when we got back Spencer was the first one in the courtroom and greeted Dave and me, telling us that he came back early and found the document. This document specifically referred to Leonard Screen being a Supervisor and Team leader making him exempt.

Another aspect of the trial that baffled me in terms of foul play came when Mr. Remer, the plaintiff's lawyer, was cross-examining Marissa Marino. Mr. Remer asked if Marissa Marino cut a deal with Dave Rudra and continued further to ask if she had paid him any money and how much. Now the only way Mr. Remer could have knowledge of any existing agreement that took place several years ago between Marissa Marino and Dave Rudra would be if he was tipped off by Mr. West who spoke with Marissa Marino just prior to coming to court. During the opening of the trial witness selection, Mr Remer listed Marissa as a witness but objected to using her and claimed to the judge he did not have her contact information. Dave paid the process server four times to skip trace her then serve her at the last hour. The process server also took the stand on the second day of trial.

_____    Date: 3/29/2012
Signature of Declarant

Jennifer Vandermolen
Name of Declarant

**IN WITNESS WHEREOF**, the foregoing instrument was, sworn to (or affirmed), subscribed and acknowledged before me this 29 day of March, 2012 by: Jennifer Vandermolen who has produced ~~Florida Drivers License No~~ LC Jamaica Drivers Lisence # 14247 as identification and did take an oath before a Florida Notary Public.

_____
NOTARY PUBLIC, State of Florida

Lenuam Garcia
Notary Printed Name

LENUAM GARCIA
MY COMMISSION # EE163573
EXPIRES January 26 2016
FloridaNotaryService.com
(407) 398-0153

My Commission Expires: 1/26/2016

Commission No. EE165573

Witness: _____    Witness: _____
Printed Name: Anely Lanoz   Printed Name: Ailen Lanoz
Address: 1550 Madruga Ave  Address: 1550 Madruga Ave.
Suite 403, Coral Gables    Suite 403, Coral
FL 33146                   Gables FL. 33146.